IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 4, 2010 Session

## STATE OF TENNESSEE v. DAVID SMITH

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-04399      Chris B. Craft, Judge**

**No. W2009-02002-CCA-R3-CD  - Filed June 17, 2010**

The defendant, David Smith, was convicted by a Shelby County Criminal Court jury of second degree murder, a Class A felony, and sentenced to twenty-four years in the Department of Correction.  On appeal, he argues that: (1) the trial court erred in allowing hearsay testimony under the dying declaration exception; (2) the trial court erred in conducting its own voir dire of the defendant regarding his decision to testify; (3) the trial court erred in giving a jury instruction on flight; (4) the evidence was insufficient to sustain his conviction; and (5) the trial court erred in enhancing his sentence based on the use of a firearm.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Robert Wilson Jones, District Public Defender; Barry W. Kuhn, Assistant Public Defender (on appeal); and Sanjeev Memula and Glenda A. Adams, Assistant Public Defenders (at trial), for the appellant, David Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; and Alanda Horne Dwyer and Dean DeCandia, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

This case arises out of the February 2007 shooting of the victim, Horace Brewer, for which the defendant was indicted on one count of first degree premeditated murder.

**State's Proof**

At trial, Marie Brewer, the victim's mother, testified that the victim was twenty-six years old when he was killed, and she identified photographs of him for the record.

Regina Payne testified that she worked at a beauty salon on Park Avenue and said that there is a laundromat next door to the salon in the strip mall. Payne stated that she arrived to work on February 24, 2007, around 8:00 or 8:30 a.m. and that nothing unusual happened until she "heard pow, pow, pow-pow" and her clients started running. Payne recalled that she heard five gunshots, and she walked toward the front of the store to see what was going on. She saw two people walking away from the end of the strip mall and saw a man standing in front of the laundromat who pointed and said, "[D]ude just got shot."

Payne testified that she walked to where the man was pointing and saw a young man lying on the ground. She recalled that "[h]e was pulling on the under carriage of the vehicle trying to get up," but he was not able to because "he wasn't able to move the lower part of his body." Payne said that the victim was frantic and was bleeding in the area of his genitals. She also observed holes in the back of the victim's shirt. Payne tried to calm the victim down by asking if he had children and carrying on general conversation. However, the victim started to "fad[e] in and out." She noted that his eyes had become glassy and that his face was colder than the temperature outside.

Payne testified that she asked the victim if he had been fighting to which he responded negatively, so she asked him what happened. The victim told Payne that a man named David who "used to work with [his] gal" shot him. Payne asked the victim again if he had been fighting, and the victim said, "[N]o, we got into an argument four years ago." Payne estimated that she waited forty-five minutes for the ambulance and police to arrive, but the victim was in and out of consciousness for the last twenty minutes. Payne recalled that right before the ambulance pulled up, the victim mouthed, "I can't breathe, but there . . . weren't words actually coming out. And [she] had a feeling he was . . . passing away then." She believed that the victim died as he was loaded into the ambulance.

On cross-examination, Payne testified that she heard the gunshots between 9:30 and 10:00 a.m. Asked if she remembered testifying at the preliminary hearing that "[the victim] appeared to be fairly calm . . . I don't believe he could move the bottom portion of his body," Payne said, "No. When you're talking about calm, . . . what I'm saying is that he's pulling -- but this isn't moving. It isn't like he's, you know, doing that."

Chris Feichter, an employee of Technicolor Thompson, testified that the victim, Rachel Swauncy, and the defendant all worked for Technicolor Thompson in 2003. The

victim and Swauncy "were boyfriend and girlfriend, later on to be engaged. They ended up having a child together." Feichter recalled that at some point in mid-2003, the defendant and Swauncy got into a verbal altercation and had to be physically separated to prevent it from escalating. He said that the two had gotten along with each other prior to the altercation, but "both seemed to hold a grudge . . . [and] didn't really want to deal with each other" afterwards.

Rachel Swauncy, the victim's fiancée and mother of his child, testified that she and the defendant worked together at Technicolor in 2003 and got into a "loud argument" with each other. She said that she did not tell the victim about the altercation because "[s]ometimes he was a little protective," but somehow he found out about it and was mad. However, she never personally witnessed or heard of any dispute between the victim and the defendant. Swauncy and the defendant did not really speak to one another again after the argument.

Swauncy testified that around 9:30 the morning of February 24, 2007, the victim went to the laundromat to wash the sheets because his niece had wet the bed. She received a phone call around 9:40 a.m. from "Rico," which caused her to go to the laundromat. At the scene, she saw the victim lying on the ground, "straining, trying to get up," and people standing around him. The victim was trying to breathe, but she could tell that he could not breathe very well.

Swauncy testified that she asked the victim what happened, and he told her that "David shot [him]. David that works with [her] at Technicolor." Swauncy said that she did not know to whom the victim was referring because it had been three or four years since she had worked with the defendant. The victim also told her that he could not breathe, "that he loved [her] and take care of the baby, then he closed his eyes." Swauncy smacked the victim in the face a couple of times because she was afraid he was dying, which caused him to open his eyes back up but then he closed them for good. Swauncy testified that she saw the victim get loaded into the ambulance and when she arrived at the hospital, she was told he was dead. At some point later, Swauncy went to the police station to look at a photographic array, out of which she identified the David that worked with her at Technicolor.

On cross-examination, Swauncy testified that it took her seven or eight minutes to get to the laundromat after she received the call from Rico. Swauncy said that she was not sure whether the victim said David who *works* or *worked* at Technicolor. Swauncy estimated that she talked to the victim for thirty minutes before the ambulance arrived, and he was having trouble breathing the entire time.

Daniel Mayer, an employee of Direct Tech Southwest – a company that subcontracts for Direct TV, testified that he was doing service calls in the Orange Mound area of Memphis on the morning of February 24, 2007. A little before 10:00 a.m., Mayer was in his vehicle at the intersection of Semmes Street and Park Avenue when he heard gunshots coming from the parking lot in front of a laundromat in a shopping plaza. Mayer said that he saw someone standing faced toward the building, shooting down at the ground. The gunman was wearing "a dark colored hoodie, black or dark navy blue[.]" After the gunman finished shooting, he went toward the street and got into the driver's side of a maroon and tan Grand Marquis car.

Mayer testified that he saw that the Grand Marquis was about to pass him, so he pulled over to take its description as it passed. He called 911 immediately, but the line was busy. Later, he called the Crimestoppers number and explained what he had seen to a detective. He gave a formal statement the next day. Mayer identified a photograph of what appeared to be the maroon Grand Marquis he saw the gunman drive away in after the shooting.

On cross-examination, Mayer testified that it was around 9:45 a.m. when he was at the intersection of Semmes Street and Park Avenue. He estimated that he was less than 200 feet away from the shooting. The gunman had the hood pulled up over his head and was wearing dark clothes, and Mayer could not tell whether the gunman was male or female. Mayer said that the windows on the Grand Marquis were tinted, and he could not see whether there was someone other than the gunman in the car.

Officer Sean Boyette with the Memphis Police Department testified that he was on patrol in the area of Park Avenue and Getwell Road around 11:30 a.m. on February 24, 2007, when he received a radio broadcast with the description of a vehicle involved in a homicide. Shortly after receiving the dispatch, a vehicle matching the description passed in front of his location, and he could see that there were two individuals in the car.

Officer Boyette testified that he pulled out behind the vehicle, and it shifted from the right-hand lane into the left-hand lane. The vehicle made an abrupt left turn onto a residential street, and Officer Ortega pulled his car in behind it. Officer Boyette went to the next street over in an attempt to catch up with the vehicle. He saw the vehicle make a right turn, and he pulled in behind it. The vehicle took another right turn, and then Officer Boyette turned on his lights and initiated a traffic stop. Officer Boyette confirmed with the dispatcher that the license plate number on the vehicle matched that of the suspect vehicle.

Officer Boyette testified that the defendant was the driver of the car, and an individual named Demario was in the front passenger seat. When he removed the defendant

from the car, Officer Boyette found a live nine-millimeter round of ammunition in the driver's seat. In the passenger compartment, Officer Boyette found, among other things, a jacket or sweatshirt of some kind and a tee shirt. On cross-examination, Officer Boyette testified that the defendant immediately pulled over when he initiated the traffic stop.

Officer Catrice Dye with the Memphis Police Department testified that she arrived to a scene in the area of Park Avenue and Semmes Street the morning of February 24, 2007, around 10:00 a.m. Officer Dye secured the scene and called for other officers to help control the crowd so any evidence would not get destroyed.

Officer Lavern Jones, a member of the Memphis Police Department Crime Scene Unit, testified that he diagramed and photographed the scene. Officer Jones also collected evidence, including one live nine-millimeter bullet as well as nine spent nine-millimeter shell casings.

Officer Myron Lawrence with the Memphis Police Department testified that he obtained a DNA sample from the defendant on February 25, 2007, after he had been charged with first degree murder.

Officer James K. Smith, a member of the Memphis Police Department Crime Scene Unit, testified that he processed the Grand Marquis involved in this case. From the car, he removed "a black hoodie sweatshirt and another black cloth shirt."

Thomas Helldorfer, formerly an officer with the Memphis Police Department Homicide Division, testified that he was in charge of the investigation in this case. Helldorfer assigned various duties to different officers. Helldorfer stated that after the suspect vehicle was stopped, the officers determined that the passenger was Demario Smith, the defendant's brother. Helldorfer said that a DNA sample was obtained from Demario Smith and transported to the Tennessee Bureau of Investigation ("TBI").

Dr. Feng Li, an assistant medical examiner for Davidson County, testified that he performed the autopsy on the victim in this case. Dr. Li stated that the victim suffered a total of seven gunshot wounds to the body – one to the left flank, one to the left groin, two to the left thigh, one to the right thigh, one to the genitals, and one to the left side of his back. A toxicology analysis of the victim revealed that he had marijuana metabolites or "break down products" in his blood. Dr. Li determined that the victim's cause of death was multiple gunshot wounds, and the manner of death was homicide. Dr. Li said that any of the gunshot wounds were potentially fatal, but the shot to the back was the most severe because it injured the lung and impaired breathing.

Agent James Russell Davis, a forensic scientist with the TBI, testified as an expert in gunshot residue analysis that he examined a shirt and a sweatshirt recovered in this case. Agent Davis stated that no particles of gunshot primer residue were found on the shirt, but particles were found on the sweatshirt, specifically on both sleeves. Agent Davis said that even if one fired a gun, rubbing hands together or driving would reduce the gunshot primer residue on one's hands.

Agent Patrick Ihrie, with the TBI Crime Laboratory DNA and Serology Unit, testified as an expert in DNA analysis that he examined the shirt and sweatshirt recovered in this case. Agent Ihrie was only able to get a partial DNA profile off the shirt and sweatshirt, but the partial profile was consistent with the defendant's DNA. Demario Smith was excluded as a possible contributor of the DNA found on both articles. Agent Ihrie said that the probability of someone else in the African-American population having the same DNA as the partial profile found on the sweatshirt was one in seventy-two million.

**Defendant's Proof**

Demetria Smith, the defendant's sister, testified that she went to the defendant's house around 9:15 the morning of February 24, 2007, to pick up laundry that she had washed the night before. She looked in Demario Smith's bedroom and noted that he was there prior to heading to the laundry room. After getting her clothes together, Demetria[1] "went to [the defendant's] room and [saw] that he was there." Demetria stated that there were two vehicles outside the house when she arrived, a burgundy Grand Marquis "with a rag top" and her mother's white Grand Prix.

On cross-examination, Demetria admitted that she never went to the police to inform them that she was at the defendant's house during the time frame of the shooting. She also admitted that the defendant's house at 3225 Carrington Road is near the Park Avenue and Semmes Street area. Demetria stated that the burgundy Grand Marquis was Demario's car, and the defendant drove it "[s]ometimes."

The defendant testified that he was at his house at 3225 Carrington Road the morning of February 24, 2007, until around 10:50 a.m. when he and Demario left to attend their niece's 11:00 a.m. birthday party. Asked if he tried to evade the police as he was driving, the defendant explained that police officers got behind him as he was getting ready to turn around and go back to the house to put on another pair of shoes. The defendant said that

---

[1]Since the defendant and two of the individuals share the same last name, we will refer to the two individuals by their first names. We intend no disrespect by doing so but wish to avoid having to repeatedly refer to these individuals by their full names.

when he was arrested, he was wearing a white shirt and black and green pants. He said Demario was wearing "a dark colored hoodie with some dark colored jeans." He stated that the hoodie found in the car belonged to Demario although he had worn it a couple of times. The defendant said that he did not recall seeing a bullet in the car.

With regard to his altercation with Rachel Swauncy when he worked at Technicolor, the defendant said, "[W]e had words, but it was nothing serious." He said that when he walked out of work the day of the altercation to where Demario was waiting to pick him up, he saw Demario arguing with the victim and he "broke it up."

On cross-examination, the defendant testified that he only drove his brother's car when his brother was with him. The defendant stated that when he was winding through the residential area after turning off Park Avenue, he did not notice that a police car was behind him until it turned on its lights. The defendant said that "[i]t was probably a misunderstanding" if the police thought that he told them that he did not leave his house until 1:00 p.m. to go to his niece's birthday party the day of the shooting.

At the conclusion of trial, the jury convicted the defendant of the lesser-included offense of second degree murder.

## ANALYSIS

### I. Hearsay

The defendant argues that the trial court erred in allowing hearsay testimony under the dying declaration exception. He asserts that "there was no medical proof to assist the trial court in determining whether the [victim] thought that death was imminent."

The first statement at issue was allowed during Regina Payne's testimony. Payne testified that the victim was "frantic" when she first arrived to him, and she tried to calm him down by carrying on a general conversation. During their conversation, the victim started "fading in and out," and his eyes became "glassy." Payne testified that the victim told her, in response to her asking him what had happened, that "this guy shot me . . . his name was David. He used to work with my gal."

The second statement at issue was allowed during Rachel Swauncy's testimony. Swauncy testified that when she arrived at the scene, the victim was "straining" and trying to breathe, but she could tell that he could not breathe very well. She asked the victim what happened, and he said, "David shot me. David that works with you at Technicolor." He also told her that he could not breathe and said that "he loved [her] and take care of the

-7-

baby," then closed his eyes. Swauncy stated that she got him to open his eyes one last time by smacking him in the face, but then he closed his eyes for good.

In deciding to allow the victim's statement to Regina Payne, the trial court found that "under these circumstances, particularly her description of him as his changed mood, that he made these statements under the belief that death was imminent, and especially in light of his condition, and the blood . . . ." The court concluded that the victim's statement to Rachel Swauncy showed that he believed death was imminent because he told her to take care of his child.

Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Id. 802. The dying declaration is one such exception to the hearsay rule. Rule 804(b)(2) of the Tennessee Rules of Evidence provides that "a statement made by a declarant while believing that the declarant's death was imminent and concerning the cause or circumstances of what the declarant believed to be impending death" is an exception to the rule against hearsay.

This court has noted that a statement must satisfy the following five elements to qualify as a dying declaration: (1) the declarant must be dead at the time of the trial; (2) the statement is admissible only in the prosecution of a criminal homicide; (3) the declarant must be the victim of the homicide; (4) the statement must concern the cause or the circumstances of the death; and (5) the declarant must have made the statement under the belief that death was imminent. State v. Hampton, 24 S.W.3d 823, 828-29 (Tenn. Crim. App. 2000). The last requirement provides the indicia of reliability and truth that justifies admission of the statement. See Neil P. Cohen et al., Tennessee Law of Evidence, § 8.35[2][f] (5th ed. 2005). "[I]t is not necessary that the declarant state unequivocally a belief that death is imminent. Awareness of impending death has been inferred from the language and condition of the declarant, the facts and circumstances surrounding the statement, and medical testimony concerning the seriousness of the victim's condition." State v. Maruja Paquita Coleman, No. 01C01-9401-CR-00029, 1997 WL 438169, at *5 (Tenn. Crim. App. July 31, 1997) (footnotes omitted), perm. to appeal denied (Tenn. Apr. 13, 1998).

We conclude that the trial court did not err in admitting the victim's statements to Regina Payne and Rachel Swauncy under the dying declaration exception to the rule against hearsay. The evidence showed that the victim had been shot seven times, he was frantic, having trouble breathing, bleeding, and fading in and out of consciousness. He died before he arrived at the hospital. From these facts and circumstances, it can be inferred that the victim believed his death was imminent when he made the statement to Payne. Moreover,

in addition to the above facts and circumstances, his expression of love to Swauncy and asking her to take care of his child clearly indicate that he believed he faced impending death when he made the statement to Swauncy.

## II. Voir Dire

The defendant argues that the trial court erred in conducting additional voir dire regarding his decision whether or not to testify. He asserts that his "change of mind . . . would indicate that the statement to him by the court about not getting his case to the jury had an influence on [his] waiver."

After Demetria Smith testified for the defense, defense counsel voir dired the defendant regarding whether he would testify. The defendant acknowledged that he had the right to testify or not testify, that the jury could not hold it against him if he did not testify, and that he had consulted with his attorneys about the advantages and disadvantages of testifying. The defendant said that he was aware of his attorneys' recommendations, and he waived his right to testify. Thereafter, without any objection, the court conducted additional voir dire, more thoroughly pointing out that the advantage of testifying was that he would get to tell his story, but the disadvantage was that he would be subject to cross-examination. When the court asked the defendant if he was freely and voluntarily making the decision to waive his right to testify, the defendant stated that he needed to talk to his attorneys again. The defendant then told the court that he wanted to testify.

In Momon v. State, 18 S.W.3d 152 (Tenn. 1999), our supreme court held that the right of a defendant to testify in his or her own behalf is a fundamental constitutional right that must be personally waived by the defendant. Id. at 161. To ensure that the defendant has personally waived that right, "defense counsel shall request a hearing, out of the presence of the jury, to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify." Id. at 162. No particular litany need be used; however, defense counsel must at a minimum show "that the defendant knows and understands that":

> (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;

> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

Id.

Initially, it is our view that the trial court did not err in further questioning the defendant regarding his decision not to testify because the court was not satisfied after questioning by defense counsel that the defendant was making a valid waiver of his right. After the defendant spoke with his attorneys and informed the court that he wanted to testify, the trial court stated, "I discussed with you, just to make sure we understand, because when . . . your attorney asked you first, and the reason I asked you some questions is he asked you first and you seemed a little reticent or a little hesitant." While under normal circumstances the trial court should not be involved in the voir dire of the defendant, our supreme court has said that the trial court "is obliged to question the defendant directly to the extent necessary to ensure a valid waiver" when there is evidence that the defendant is not making a valid waiver. Id. The questioning by the trial court was concise and within the appropriate bounds for determining the validity of the defendant's waiver.

In any event, even if the court erred, such error was harmless. The State's case against the defendant was relatively strong. By testifying, the defendant was able to corroborate his sister's testimony that he was asleep at home at the time of the murder and offer an explanation for why he made turns in the residential area prior to being pulled over by Officer Boyette. Moreover, he was not impeached by cross-examination regarding any prior convictions.

### III. Flight

The defendant argues that the trial court erred in giving a jury instruction on flight. He asserts that "nothing in the record . . . indicates that [he] was attempting to evade the officer or flee."

Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987); see also State v. Phipps, 883 S.W.2d

138, 142 (Tenn. Crim. App. 1994). A charge is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Erroneous jury instructions require reversal unless the error is harmless beyond a reasonable doubt. See Welch v. State, 836 S.W.2d 586, 591 (Tenn. Crim. App. 1992).

A flight instruction is warranted when "proof of 'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown' " has been presented at trial. State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). The State can satisfy the subsequent hiding out, evasion, or concealment requirement by introducing evidence from which a jury might infer such action. State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999) (citing Payton, 782 S.W.2d at 490; Rogers v. State, 455 S.W.2d 182, 186-87 (Tenn. Crim. App. 1970)). "Any contradictory evidence that serves to rebut the [S]tate's proof merely raises a question for the jury to resolve." Id. (citing Hall v. State, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979)).

It is our view that, while far from dispositive, there was arguably enough evidence of flight to fairly raise the issue for the jury's determination. Officer Boyette testified that the defendant changed lanes right after he pulled in behind him. The defendant then made an abrupt left turn onto a residential street, but Officer Ortega was also able to make the turn behind him. Officer Boyette went to the next street over in an attempt to catch up with the defendant. He saw the defendant make a right turn, and he pulled in behind him. The defendant took another right turn, and then Officer Boyette turned on his lights and initiated a traffic stop. As noted by the trial court in deciding to give the instruction,

> there is proof in the record that [the defendant] left the scene of the difficulty and then he subsequently, taking the State's case in its best light, evaded when the police car pulled in behind him, he made several quick turns in a residential neighborhood, which the jury could easily take to show that he had guilty knowledge that they were looking for him or his car, and he wanted to turn away from the police car to evade being arrested or pulled over. The fact that he eventually did pull over is fine, and the jury can consider that, but I think under the circumstances, there's enough proof in the record to charge flight.

In any event, even if it was error for the trial court to give the flight instruction, such error was harmless beyond a reasonable doubt. As noted by our supreme court in State v. Smith, 893 S.W.2d 908 (Tenn. 1994):

-11-

Even if an instruction on flight should not have been given, any error is not reversible. The Court instructed the jury that whether the Defendant fled was a question solely for their decision, that they need not infer flight, and that flight alone was insufficient to prove guilt. This, coupled with the overwhelming proof of Defendant's guilt, renders any error as to the flight instruction harmless.

Id. at 918.

Just as in Smith, the trial court instructed the jury that whether the defendant fled was a question for its determination and that flight alone was not sufficient to find the defendant guilty. The instruction, read as a whole, and in light of the facts of this case, renders any error in giving the flight instruction harmless.

## IV. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence. The defendant does not dispute that a second degree murder occurred; he disputes that he was the perpetrator of the offense. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary

-12-

instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In the light most favorable to the State, the evidence shows that the victim identified his killer in a dying declaration as David who used to work with his fiancée, Rachel Swauncy, at Technicolor. The proof established that the defendant, David Smith, used to work with Rachel Swauncy at Technicolor. Daniel Mayer, a witness to the shooting, testified that the gunman was wearing "a dark colored hoodie, black or dark navy blue" and was driving a maroon and tan Grand Marquis car. Later, the defendant was stopped in the neighborhood of the shooting, driving a maroon and tan Grand Marquis with a license plate number matching the number on the suspect vehicle.

When police officers removed the defendant from the vehicle after being pulled over, they found one live nine-millimeter bullet in the driver's seat and a black hoodie sweatshirt in the passenger compartment. The crime scene officers discovered nine spent nine-millimeter shell casings and one live nine-millimeter round at the crime scene. Analysis conducted by the TBI crime laboratory determined that the black hoodie sweatshirt found in the defendant's vehicle was positive for gunshot residue. TBI personnel also conducted DNA analysis on the sweatshirt. Although only a partial DNA profile could be obtained from the sweatshirt, the partial profile was consistent with the defendant's DNA and Demario Smith was excluded as a possible contributor. The likelihood of someone else having the same DNA as the partial profile found on the sweatshirt is one in seventy-two million. This evidence was more than sufficient to sustain the jury's verdict.

## V. Sentence Enhancement

In sentencing the defendant, the trial court noted that the defendant faced a range one sentence of fifteen to twenty-five years as a violent offender. The court enhanced his sentence based on its finding that he had a previous history of criminal convictions, Tenn. Code Ann. § 40-35-114(1); that he possessed or employed a firearm in the commission of the offense, id. § 40-35-114(9); and that he committed a delinquent act as a juvenile that would constitute a felony if committed by an adult. Id. § 40-35-114(16). The court sentenced the defendant to twenty-four years in the Department of Correction.

-13-

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

The defendant concedes that the possession or employment of a firearm is not an essential element of second degree murder but argues that the trial court erred in enhancing his sentence based on such factor because doing so "[w]as not appropriate for the offense." He asserts that "the use of a deadly weapon should not be considered an enhancement factor per se in any case of murder second degree. The sentencing court should be required to go further and show how the use of the weapon increases the culpability of the offense in a particular case."

The defendant's argument, while unique, is without support in this court's precedent. This court has repeatedly upheld the enhancement of a defendant's sentence with the "firearm, explosive device, or other deadly weapon" factor when a defendant commits second degree murder by shooting a victim with a firearm. See State v. Moss, 13 S.W.3d

374, 388 (Tenn. Crim. App. 1999); State v. Butler, 900 S.W.2d 305, 312-13 (Tenn. Crim. App. 1994); State v. Raines, 882 S.W.2d 376, 385 (Tenn. Crim. App. 1994); State v. Derek T. Payne, No. W2001-00532-CCA-R3-CD, 2002 WL 31624813, at *16 (Tenn. Crim. App. Nov. 20, 2002), perm. to appeal denied (Tenn. May 19, 2003); State v. Timothy Ken Sexton, No. E2000-01779-CCA-R3-CD, 2002 WL 1787946, at *18 (Tenn. Crim. App. Aug. 2, 2002). The defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE